Thomas P. Smith, Jr.
Sandeep Satwalekar
Peter A. Mancuso
William T. Conway III
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-5562 (Mancuso)
mancusope@sec.gov

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>            -against-<br><br>HONG WANG (a/k/a "JOHN WANG") and PRECISION CLINICAL CONSULTING, LLC,<br><br>                    Defendants. | **COMPLAINT**<br><br>26 Civ. 10140<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against Defendants Hong Wang (a/k/a "John Wang") ("Wang") and Precision Clinical Consulting, LCC ("Precision") (collectively, "Defendants"), alleges as follows:

**SUMMARY**

1.      This case involves insider trading by Defendants Wang and Precision in the securities of the biopharmaceutical company C4 Therapeutics, Inc. ("C4" or the "Company"). Defendants unlawfully used material nonpublic information ("MNPI") to trade the securities of C4 ahead of the Company's public announcement on December 12, 2023 that it had achieved positive clinical trial

1

results for its flagship multiple myeloma and non-Hodgkin lymphoma drug known at the time as "CFT7455" (the "Public Announcement").

2. From June 30, 2023 to June 30, 2024, Wang worked as a biostatistician for C4 in a consulting capacity. In connection with this engagement, Wang obtained MNPI about C4's positive clinical trial results for CFT7455 prior to the Public Announcement.

3. On the basis of that MNPI, between November 20, 2023 and December 12, 2023, Wang used four brokerage accounts, one of which belonged to Precision—a company that he controlled—to purchase 160,430 shares of C4 common stock, including 76,740 shares mere hours before the Public Announcement.

4. Prior to November 20, 2023, Defendants never traded C4 securities.

5. Over the two trading days immediately following the Public Announcement, C4's stock price rose by approximately 114%, netting Defendants approximately $489,739 in realized and unrealized gains.

## **VIOLATIONS**

6. By virtue of the foregoing conduct and as alleged further herein, Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

7. Unless Wang is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## **NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT**

8. The SEC brings this action pursuant to the authority conferred upon it by Exchange Act Sections 21(d) [15 U.S.C. § 78u(d)] and 21A(a) [15 U.S.C. § 78u-1(a)].

9. The SEC seeks a final judgment: (a) permanently enjoining Wang from violating the

federal securities laws and rules this Complaint alleges he has violated; (b) ordering Wang and Precision to disgorge any ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) & 78u(d)(7)]; (c) ordering Wang to pay civil money penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-1]; and (d) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to Exchange Act Section 27 [15 U.S.C. § 78aa].

11. Defendants, directly or indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

12. Venue lies in this District under Exchange Act Section 27 [15 U.S.C. § 78aa]. Defendant Wang transacted business in the District of Massachusetts, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District. For example, Wang obtained MNPI through his consulting engagement with C4 and communications with other employees at the Company, which is located in Watertown, Massachusetts.

## DEFENDANTS

13. **Wang**, age 59, is a resident of East Brunswick, New Jersey. He obtained his doctorate of philosophy ("PhD") in biology and biological sciences from the University of Arizona in or around 2002. Since then, he has worked as a pharmacologist and biostatistician at several pharmaceutical companies. Wang is the owner and president of a biostatistical consulting firm, TechData International LLC ("TechData"). Between June 30, 2023 and June 30, 2024, Wang provided biostatistical consulting services to C4 relating to its CFT7455 clinical trials.

3

14. **Precision**, is a New Jersey limited liability company formed in 2008, with a principal place of business in East Brunswick, New Jersey. On February 16, 2025, Precision filed a Certificate of Dissolution and Termination with the Department of Treasury for the State of New Jersey. As of the filing of this Complaint, Precision maintains assets in an active brokerage account, which was controlled by Wang at all relevant times.

## OTHER RELEVANT ENTITY

15. **C4** is a Delaware corporation formed in 2015, with a principal place of business in Watertown, Massachusetts. C4 is a clinical-stage biopharmaceutical company that focuses on drug research and development. Since in or around September 2020, C4's securities have been registered with the Commission pursuant to Section 12(b) of the Exchange Act and have traded on the NASDAQ under the symbol "CCCC."

## FACTS

### I.  Background on C4 and CFT7455

16. C4 is a publicly-traded biopharmaceutical company that focuses on the research and development of clinical-stage drugs.

17. C4 focuses, in particular, on "targeted protein degradation science," which is a methodology used to develop medications that treat various cancers.

18. C4 began clinical trials for CFT7455—its flagship multiple myeloma and non-Hodgkin lymphoma drug—in June 2021 using an initial dosing schedule of 21 days on the drug, followed by 7 days off the drug (the "21/7 Schedule").

19. On April 8, 2022, C4 issued a press release announcing its first-time clinical data for CFT7455 (the "April 8, 2022 Press Release"), which revealed disappointing results due to some patients experiencing negative side-effects.

20. On the same day, C4 announced its plan to change CFT7455's dosing regimen in an

effort to resolve the negative side-effects found during the first clinical trial. The new dosing schedule was adjusted to 14 days on the drug, followed by 14 days off the drug (the "14/14 Schedule").

21. Following the disappointing results publicized in the April 8, 2022 Press Release, C4's stock price declined from a high of $22.98 on the day of the announcement to close at $8.01 per share by the end of the next trading day.

## II. Background on Wang's Consulting Engagement at C4

22. On June 30, 2023, Wang began biostatistical consulting for C4 through his firm, TechData.

23. Wang, on behalf of TechData, signed a consulting agreement with C4 (the "Consulting Agreement") for an initial term of three months, which was extended three times to ultimately run through June 30, 2024. Wang was the only TechData employee that worked for C4 under the Consulting Agreement.

24. The Consulting Agreement called for TechData to provide biostatistical oversight and analysis of C4's clinical trial data.

25. From June 30, 2023 to December 12, 2023, C4 required Wang to conduct biostatistical analysis on the clinical trial data related to CFT7455.

## III. C4's Policies Prohibiting Insider Trading

26. Wang knew, by virtue of the terms of the Consulting Agreement and the insider trading training he received from C4, that he was subject to C4's policies and procedures, including policies relating to confidential information and insider trading.

### A. The Consulting Agreement Imposed a Duy of Confidentiality

27. The Consulting Agreement contained confidentiality provisions and warned about the illegality of insider trading.

28. For example, the Consulting Agreement prohibited Wang from "us[ing], except in the

5

course of performance of [his] duties for C4 … any Confidential Information."

29. The Consulting Agreement defined "Confidential Information" broadly to include "proprietary information of C4… including … inventions, or any other scientific, technical or trade secrets of C4[]."

30. The Consulting Agreement defined "trade secrets" as "any secret scientific [or] technical … information, or any design, process, procedure, formula, invention, [or] improvement."

31. By signing the Consulting Agreement, Wang expressly acknowledged that "Confidential Information may contain material non-public information concerning C4[];" that he was "aware of the restrictions imposed by U.S. federal and state securities laws, and the rules and regulations promulgated thereunder, on persons in possession of material non-public information concerning a company whose securities are publicly traded that prohibit purchasing or selling securities of that company;" and that he was prohibited from using "any of the Confidential Information … in connection with the purchase or sale of securities."

### B. Wang Received Training on Insider Trading

32. Prior to the trades in question, Wang also completed multiple trainings provided by C4 on the prohibition against insider trading.

33. For instance, on July 6, 2023, Wang received C4's: (1) Statement of Company Policy on Insider Trading and Disclosure (the "Insider Trading Policy") and (2) Special Trading Procedures for Insiders.

34. The Insider Trading Policy covered "trading in [C4's] securities," warned of the "severe consequences associated with violations of insider trading laws," and advised Wang of his "obligation to understand and comply with [the] Insider Trading Policy."

35. The Insider Trading Policy explained insider trading in layman's terms.

36. For instance, the Insider Trading Policy stated that it is "generally illegal for any …

consultant of [C4] to buy or sell the securities of [C4] … while in possession of material, nonpublic information about [C4]."

37. The Insider Trading Policy defined "material" as "any type of information that could reasonably be expected to affect the market price of [C4's] securities," providing as a specific example "developments regarding any programs in preclinical or clinical development, including recent regulatory interaction and/or data that have been recently generated from ongoing or recently completed preclinical or clinical trials[.]"

38. The Insider Trading Policy further explained that:

> Material information is "nonpublic" if it has not been disseminated in a manner making it available to investors generally. To show that information is public, it is necessary to point to some fact that establishes that the information has become publicly available, such as the filing of a report with the SEC, the distribution of a press release through a widely disseminated news or wire service, publishing the information on [C4's] website or via social media if such posting is a regular way in which the [C4] communicates with investors, or by other means that are reasonably designed to provide broad public access.

39. In addition, C4's Special Trading Procedures for Insiders defined "Insiders" to include C4 consultants and expressly prohibited Insiders from "trad[ing] in any type of securities of [C4] if such Insider is in possession of material, nonpublic information about [C4]."

40. In August 2023, Wang completed C4's mandatory insider trading course. This course covered "an overview of US insider trading laws and provide[d] practical information to help employees comply" by "break[ing] down the complex concept of insider trading into easily understood elements."

41. Specifically, for example, the course provided examples of what constitutes insider trading, such as "a company employee buying company stock before a major product announcement is made publicly." It also identified "[p]ositive or negative results of a test or clinical trial" as an example of material information that—if non-public—could be considered inside information.

### IV.     Wang Obtained Material Non-Public Information About CFT7455

42.     From June 30, 2023 to December 12, 2023, Wang's consulting engagement gave him access to C4's MNPI about its clinical trials relating to CFT7455.

43.     Specifically, during this time period Wang worked closely with data that demonstrated positive results for C4's clinical trials of CFT7455 under the 14/14 Schedule. As a result, Wang had knowledge of the positive clinical trial results prior to the Public Announcement.

44.     On July 5, 2023, shortly after Wang began working as a consultant for C4, his supervisor sent a company-wide email introducing Wang as a "consultant biostatistician" who "will be providing statistical support for CFT7455" and other clinical trial stage drug programs.

45.     By September 2023, Wang's work for C4 focused exclusively on CFT7455.

46.     On September 21, 2023, Wang's consulting contract was extended for him to "support data disclosure for the upcoming [December 12, 2023] investor's meeting for CFT7455" and he was directed by his supervisor to begin "focus[ing] on the investor disclosure for CFT7455," which was considered an "important deliverable[]" within C4.

47.     Over the next ten weeks—from September 21, 2023 to December 12, 2023—Wang worked extensively with the data derived from the CFT7455 clinical trials.

48.     For example, in the weeks leading up to the Public Announcement, Wang had access to, and worked with, the following MNPI related to CFT7455:

- "Swimmer plots," which are graphical tools used to convey the positive individual patient response to the clinical trials of CFT7455;

- Data on the safety and efficacy of CFT7455, including information as to whether clinical trial patients were demonstrating a positive response to CFT7455;

- Quality control checks on the CFT7455 data;

- Materials prepared in advance of the investor call and presentation related to the Public Announcement, which explained the positive results of the CFT7455 clinical trials using the 14/14 Schedule;

8

- The tables, figures, and listings (also known as TFLs) featured in the investor presentation, which demonstrated the positive results of the CFT7455 clinical trials using the 14/14 Schedule.

49. On October 11, 2023 C4 publicly announced that it would present the new data for CFT7455 on December 12, 2023, based upon the adjusted 14/14 Schedule.

50. On November 15, 2023, Wang's supervisor informed him that this would be "an important data release for [C4]" and that he was to "prioritize the [CFT]7455 deliverable."

51. On November 16, 2023, Wang's supervisor notified him that by November 20, 2023 Wang would receive access to the data extracted from the 12 medical sites responsible for conducting the CFT7455 clinical trials.

52. Indeed, at 9:02am on November 20, 2023, C4's associate director of clinical data management informed Wang that the "study data extract has been posted," which referred to the clinical trial data being available for Wang to review and use to "refresh" C4's existing data on patient response to CFT7455.

53. At 11:05am on November 20, 2023, Wang responded to the 9:02am email confirming for C4's senior communications manager that he extracted the relevant data into a spreadsheet.

54. Moments later, at 11:25am, Wang purchased 2,000 shares of C4 common stock.

## V. Wang Purchased C4 Stock in Advance of the Public Announcement After He Obtained MNPI About CFT7455

55. In total, from November 20, 2023 through December 12, 2023, Wang purchased 160,430 shares of C4 common stock at an aggregate cost of $306,314.92.

56. Wang made these purchases on 12 different days at prices ranging between $1.10 and $2.65 per share and at an average purchase price of $1.91.

57. Wang made these purchases through four brokerage accounts that he controlled: two accounts in his name; one joint account in his and his wife's name (the "Joint Account"); and one

account in Precision's name (collectively, the "Wang Accounts").

58. Specifically, between November 20, 2023 and December 12, 2023, Wang purchased 41,740 shares through his individual brokerage accounts, 98,690 shares through the Joint Account, and 20,000 shares through the Precision account.

59. The below bar chart illustrates Wang's accumulation of C4's stock—between November 20, 2023 and December 12, 2023—prior to the Public Announcement:



60. Notably, Wang's two individual accounts and the Precision account each made all of their C4 stock purchases on December 12, 2023, mere hours before the Public Announcement.

61. Prior to November 20, 2023, the Wang Accounts never traded in C4 stock.

VI. **C4's Public Announcement of Positive Clinical Trial Results for CFT7455**

62. After the stock market closed on December 12, 2023, C4 publicly announced new data for CFT7455's clinical trial demonstrating positive results attributable to the 14/14 Schedule.

63. In the Public Announcement, C4's Chief Medical Officer stated that C4 is "excited CFT7455 monotherapy is showing promising signs of [anti-cancer] activity" and that C4 has "established 14 days on/14 days off as the optimal dosing schedule."

64. Shortly after the Public Announcement, C4 held an investor presentation—a rare instance for the Company, which only conducted investor presentations to disclose meaningful events.

10

65. During the investor presentation, C4's Chief Executive Officer further explained that the "adjustment to 14 days on, 14 days off schedule is now yielding expected results [and t]he totality of the data to date supports the CFT7455 as a potential therapy option for [cancer] across multiple lines of treatment."

66. The investor presentation included a slide deck that reiterated the positive results found within the clinical trial data.

67. During the weeks leading up to the Public Announcement, Wang worked on, and had access to the information contained in, the investor presentation.

68. Analysts and investors reacted positively to the Public Announcement.

69. For example, some investors offered "congratulations" during the investor presentation and some analysts described the new data as a "positive surprise" that was "much better on efficacy and safety."

## VII. Wang Earned Significant Profits on His C4 Stock After the Market Reacted Positively to the Public Announcement

70. The stock market reacted favorably to the Public Announcement.

71. C4's stock price was $2.34 at the close of the market on December 12, 2023 and traded between $3.18 and $8.37 over the subsequent two days, finally settling at $5.01 at the close of the market on December 14, 2023—an increase of approximately 114%.

72. As C4's stock price increased, Wang began selling some of the C4 stock he had recently acquired to realize a profit.

73. On December 13, 2023, the Wang Accounts sold 20,000 shares of C4 common stock at prices ranging from $4.50 to $5.00 per share.

74. Specifically, each of the four Wang Accounts sold the same quantity of shares (5,000 each) within 67 minutes.

75. On the December 13, 2023 sales alone, the Wang Accounts realized a profit of

11

approximately $48,370—$10,650 of which was generated in the Precision account.

76. In addition to the realized profits from the December 13, 2023 sales, the remaining 140,430 shares of C4 stock held in the Wang Accounts had unrealized gains of approximately $441,369.

77. As of December 14, 2023, the Wang Accounts generated a total of approximately $489,739 in realized and unrealized profits on the C4 stock purchases discussed herein—approximately $48,000 of which were generated in the Precision account.

## CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Both Defendants)

78. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 77.

79. By engaging in the conduct described above, Defendants, directly or indirectly, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

80. By reason of the foregoing, Defendants, directly or indirectly, have violated—and unless enjoined Wang will again violate—Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a Final Judgment:

**I.**

Permanently restraining and enjoining Wang and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Ordering Wang and Precision, jointly and severally, to disgorge all ill-gotten gains Precision received directly or indirectly, with prejudgment interest thereon, as a result of the alleged violations pursuant to Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)];

**III.**

Ordering Wang to disgorge all ill-gotten gains he received directly or indirectly, with prejudgment interest thereon, as a result of the alleged violations pursuant to Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)];

**IV.**

Ordering Wang to pay civil monetary penalties under Exchange Act Section 21A [15 U.S.C. § 78u-1];

**V.**

Granting any other and further relief this Court may deem just and proper.

Dated: New York, New York  /s/ Peter A. Mancuso
January 14, 2026  Thomas P. Smith, Jr.
Sandeep Satwalekar
Peter A. Mancuso
William T. Conway III
Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-5562 (Mancuso)
Email: MancusoPe@sec.gov
*Attorneys for Plaintiff*